FILED
2019 Mar-18  PM 05:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | | |
|---|---|---|
| **SHARON EIDSON, an individual, and on behalf of those similarly situated,** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **CV-** |
| **ALBERTVILLE AUTO ACQUISITIONS, INC., a foreign corporation, d/b/a NISSAN OF ALBERTVILLE, and/or TEAM ONE NISSAN OF ALBERTVILLE, NISSAN OF ALBERTVILLE; SANDRA TIDWELL, an individual;** | ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL** |
| **Defendants.** | ) | |

## COMPLAINT

**COME NOW** the Plaintiffs, **SHARON EIDSON**, individually and on behalf of all those similarly situated, and for her Complaint allege and state as follows:

## INTRODUCTION

1. This lawsuit revolves around the predatory practices of automobile dealerships targeting lower-income borrowers and taking advantage of those without meaningful access to credit. These consumers thought

they were paying for a vehicle, but were unaware they were actually paying to increase the dealerships' profit margins through unlawful markups, unwanted add-ons, inflated incomes, and fraudulently inflated sales prices.

## NATURE OF THE CASE & CLASS ALLEGATIONS

2. This class action is brought under the Racketeer Influenced and Corrupt Organization Act (18 U.S.C. §§ 1961, *et seq.*) ("RICO") on behalf of Plaintiffs and putative class members (collectively "Plaintiffs," "Class," or "Class Members") that were injured by the predatory practices of Defendants to fraudulently increase loan approvals, vehicle sales, and maximize profits for themselves.

3. The allegations do not arise from the acts of a few "rogue" employees. Instead, it included many employees implementing a widespread practice, including Defendant Sandra Tidwell, a manager.

4. Defendants' predatory practices permeate their businesses and are founded upon greed and perpetuated by financial incentives.

5. The predatory practices were encouraged from the top down and were a pattern and practice of the Defendants.

6. There was a pervasive scheme throughout Defendants' automobile dealerships, which was carried on at Defendants' direction, with their participation, or with their full knowledge, approval, and ratification,

that if a prospective customer did not qualify for a vehicle loan, an employee or associate would falsify information and submit fraudulent documents to financial institutions to ensure the customer was funded; fraudulently inflate the value of a vehicle by listing accessories it did not actually include to increase the loan amount; and among other things, "pack" the loan with the cost of add-on products – such as a vehicle service contract, warranty, or gap contract – without the customer's knowledge.

7. Defendants' predatory practices threaten not only consumer safety but also the nation's financial system.

8. Defendants intended to and have benefited from the fraudulent scheme by, among other things, increasing the number of cars sold to buyers that otherwise would not have been approved for a loan, inflating the prices of vehicles, and packing loans to incorporate the cost of add-on products without the buyer's knowledge in order to maximize vehicle sales, profits, and commissions for themselves.

9. Pursuant to Rules 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following class:

 a. **All individuals in the United States who received an automobile loan processed by ALBERTVILLE AUTO ACQUISITIONS, INC.** d/b/a **NISSAN OF ALBERTVILLE** and

**TEAM ONE NISSAN OF ALBERTVILLE that arose out of the fraudulent scheme to increase sales between March 16, 2017, and the present.**

b. **All individuals whose credit has been adversely impacted as a result of the fraudulent scheme in violation of consumer protection laws between March 16, 2017, and the present.**

c. Excluded from the Class(es) are the following individuals and/or entities:

    i. Any and all federal, state, or local governments, including but not limited to their department, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

    ii. Individuals, if any, who timely opt out of this proceeding using the correct protocol for opting out;

    iii. Individuals, if any, who have previously settled or compromised claim(s) as identified herein for the Class; and

    iv. Any currently sitting Federal Judge and/or person within the third degree of consanguinity to any Federal Judge.

10. This action should be certified as a class action because:

a. Questions of law or fact are common to the Class and affect a large Class of individuals;

b. Plaintiff is a member of the Class and her claim is typical of the Class;

c. The Class consists of a sufficiently large group of individuals, believed to exceed a thousand members and is so large that it is impractical to join all members of the Class before the Court as individual Plaintiffs. The identity of Class Members is readily ascertainable through Defendants' own documents;

d. Named Plaintiff will fairly and adequately represent the claims of the Class, and protect the interests of the Class, without exercising personal interests or otherwise acting in a manner inconsistent with the best interests of the Class;

e. Named Plaintiff has retained attorneys experienced in class action litigation who will responsibly and vigorously advocate on behalf of the Class as a whole;

f. Common questions of law or fact predominate over those questions affect only individual members of the Class;

g. A class action is superior to other methods of adjudication and specifically designed to result in the fair, uniform, and efficient adjudication of the underlying claims. This class action will

facilitate judicial economy and preclude the undue financial, administrative, and procedural burdens that would necessarily result from a multiplicity of individual actions;

h. Without Class certification, the prosecution of separate actions by individual Class Members would be impracticable and financially difficult, and create a risk of repetitive, inconsistent, and varying adjudications. this would have the effect of establishing incompatible standards of conduct, discouraging the prosecution of meritorious but small claims, and/or result in adjudications that would be dispositive of the interests of other Class Members not parties to the adjudication, or otherwise substantially impair the ability of Class Members to protect their rights and interests; and

i. Defendants have acted and/or refused to act on grounds generally applicable to the Class, thereby making the award of damages, equitable relief, and/or restitution appropriate to the Class as a whole.

j. This class action seeks to recover damages stemming from Defendants' fraudulent activities prohibited under RICO; compensation for unjust enrichment, fraud, civil conspiracy, and negligence.

6

## PARTIES, JURISDICTION, AND VENUE

11. Plaintiff **SHARON EIDSON** ("Eidson") is over the age of nineteen (19) and a resident of Marshall County, Alabama. EIdson files this lawsuit on behalf of herself and all similarly situated class members as set out below.

12. Defendant **ALBERTVILLE AUTO ACQUISITIONS, INC.** is a foreign corporation, incorporated under the laws of the State of Florida, with its principal place of business in Orlando, Florida. Albertville Auto Acquisitions does business as **NISSAN OF ALBERTVILLE** and **TEAM ONE NISSAN OF ALBERTVILLE** on Highway 431 in Albertville, Alabama. Collectively, this party will be referred to as "Nissan of Albertville".

13. Defendant **SANDRA TIDWELL** ("Tidwell") is over the age of nineteen (19) and a resident of Jefferson County, Alabama, and at all times relevant to this Complaint was an employee/sales manager of Defendant Nissan of Albertville.

14. Jurisdiction is conferred on this Court by 18 U.S.C. § 1964(a) and (c) and 28 U.S.C. § 1331, as these matters arise under the laws of the United States of America. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the state law claims are so

7

related to the federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims of Plaintiffs and Class Members occurred here, and is proper pursuant to 18 U.S.C. § 1965(a) because the Defendants transacted their affairs here. Defendants do substantial business in the State of Alabama, and within this District, are registered to and are doing business within this State, and otherwise maintain requisite minimum contacts with this State and this District. Additionally, Defendants' principal places of business are in this District, and they receive substantial compensation and profits from their business in this District. Defendants are therefore subject to *in personam* jurisdiction in this District, and venue is proper because Defendants reside in this District.

## FACTUAL ALLEGATIONS

16. On or before March 16, 2017, Nissan of Albertville sent, or had sent on its behalf, a "prize notification" to Eidson and likely other Class Members.

17. The prize notification indicated that Eidson had one of four prizes, which included cash as well as up to one year of food from a national fast food chain.

18. The prize notification is a tool used by Nissan of Albertville to lure unsuspecting customers into the sale's den.

19. Nissan of Albertville hopes that the unsuspecting prize winner is elderly and/or weak minded.

20. What's more, dealers like Nissan of Albertville will intentionally and fraudulently inflate a buyer's income – as it did here – to ensure that financing is approved.

21. On or about March 16, 2017, Eidson went to the dealership in her 2009 Honda CR-V, which was paid in full.

22. All Eidson wanted was her guaranteed prize.

23. She hoped she would win the fast food, but she ended up purchasing a 2017 Nissan Rogue from the Defendants.

24. But how we got from the hope of her prize being fast food to the purchase of the new car is troubling.

25. The Defendants used high pressure sales tactics, discouraging her from calling friends or relatives, and pressuring her to test drive a car that she did not need or want and that she could not afford.

26. What's worse, is that unbeknownst to Eidson, Nissan of Albertville grossly inflated her income, packed the agreement with concealed products, and misrepresented her ability to refinance.

27. To be clear, Nissan of Albertville misrepresented Eidson's income to potential lenders, without her knowledge, consent, or approval.

28. Eidson is retired and living on a fixed income and does not have a monthly income near $3,200 – the amount included on the application.

29. The application clearly indicates that she is "retired".

30. If Nissan of Albertville does not inflate and misrepresent Eidson's income, Eidson would not have been approved for financing.

31. Nissan of Albertville knew this and Tidwell knew this, and other unknown parties knew this.

32. These Defendants knew that they would lose the sale unless they misrepresented Eidson's income to the lenders.

33. As a result of that misrepresentation, Eidson was approved for financing and the sale was completed.

34. The purchase was financed through TD Auto Finance.

35. The financing was predicated on a fraud perpetrated by the Defendants.

36. The March 16, 2017, agreement provided as follows:

    a. Annual percentage rate of 6.19%;

    b. Amount financed of $31,324.34;

    c. With payments of $461.55 for _84 months (seven (7) years)_.

d. Eidson would pay, over the course of those seven years $38,770.20.

37. The total costs and inclusion of unnecessary, and concealed, products prevented Eidson from accurately determining the total costs, the bases of the costs, and making an informed decision to complete the purchase or eliminate the unnecessary products.

38. At least on March 16, 2017, the Defendants, with their participation or with their knowledge, approval, and ratification, committed and conspired to commit fraudulent acts for the common or shared purpose of submitting false information and fraudulent documents to financial institutions to ensure a prospective customer would receive a loan if they did not otherwise qualify for a loan.

39. The ultimate objective of the fraudulent scheme was to increase the number of vehicles sold by fraudulent means and to inflate the prices of vehicles in order to maximize Defendants' vehicle sales, profits, and commissions.

40. The scheme also included packing the agreement with undisclosed products that Eidson was not informed about, did not want, did not need, and did not know about, including, but not limited to extended warranties, service contract, gap contract, clerical fees.

41. The Defendants concealed the inclusion of these products and fees in the agreement.

42. When a prospective buyer needs to obtain a car loan, the dealership collects their personal information and financial information, and other information required by financial institutions in-person or through the U.S. Mail, commercial interstate carrier, wire or other interstate electronic media.

43. Before a financial institution provides financing, the dealership is required to verify a prospective buyer's personal and financial information.

44. A sales manager then enters the prospective buyer's information in a database that submits their information to multiple financial institutions. The financial institutions could then respond with a financing offer, if any, to the customer. A finance manager would provide the prospective buyer with closing paperwork, including the paperwork for the sale itself and the car loan financing.

45. When a loan is financed, the funds from the financial institution are transmitted by wire from the lending institution directly to the dealership, employees, and associates involved in the deal are paid their commission.

46.     After the buyer signs the closing paperwork, the dealership is then required to send the funding required documents to the lending institution.

47.     The funding required documents should accurately reflect financial information including income.

48.     The dealership then submits the funding required documents to the lending institution through the U.S. Mail or commercial interstate carrier. Lending institutions will not accept the funding required documents by wire or other interstate electronic media.

49.     The Defendants, with their participation, or with their full knowledge, approval, and ratification, fraudulently increased loan approvals and vehicle sales by creating or altering documents to inflate the income for prospective buyers and submitted fraudulent documents to financial institutions.

50.     The acts and practices used by Defendants were in furtherance of the fraudulent scheme.

51.     Defendants intended to and have benefited from the fraudulent scheme by, among other things, increasing the number of cars sold to buyers that otherwise would not have been approved for a loan.

52.     The Defendants conspired to increase the number of cars sold by fraudulent means by inflating income of purchasers.

53. As part of the conspiracy, the conspirators would falsify information or documents for customers that did not qualify for car loans to ensure their car loans were funded.

54. As part of the conspiracy, the conspirators would falsely and fraudulently inflate the income information of prospective car purchasers submitted to financial institutions so customers who otherwise would not qualify for car loan funding, would show an artificially high income and would be able to obtain a loan, to ensure their car loans were funded.

55. As part of the conspiracy, the conspirators would create false documents and/or materially alter existing documents, including but not limited to income information.

56. As part of the conspiracy, the conspirators would also defraud financial institutions by making it appear that an individual who qualified for the loan purchased the vehicle, when in fact and truth the actual purchaser would not otherwise qualify.

57. On or about March 16, 2017, the Defendants misrepresented to Eidson that she would be able to refinance after a year to make the payments more affordable.

58. Eidson relied on this representation when she signed the purchase document.

14

59.   The representation was false and was known to be false when made.

60.   On or about April 4, 2017, as part of that misrepresentation, and in furtherance of the scheme, the Defendants sent Eidson a check for $3,500 to cover a portion of the first year's payments.

61.   The check would cover a seven full months of payments and about half of an eighth month.

## COUNT ONE
### (RICO Violation - 18 U.S.C. § 1962(c))

62.   Plaintiff adopts and incorporates by reference all prior factual allegations as if fully set forth herein.

63.   The Defendants, as described in the facts of this Complaint, are an enterprise engaged in, and whose activities affect, interstate commerce.

64.   The individual Defendants – known and unknown – were, at all relevant times, employed by and/or associated with Nissan of Albertville.

65.   Plaintiff alleges that in furtherance of Nissan of Albertville's fraudulent scheme, Defendants committed multiple related acts of mail fraud, wire fraud, bank fraud and identity theft and/or fraud at the direction of Defendants, with their participation or with Defendants' full knowledge, approval, and ratification.

66. The acts alleged in this Complaint constitute a pattern of racketeering activity under RICO.

67. As a direct and proximate result of the RICO violations, including the pattern of violations, Plaintiff and Class Members have been injured in their business and/or property as set out above.

## COUNT TWO
## (RICO Violation – 18 U.S.C. § 1962(d))

68. Plaintiff adopts and incorporates by reference all prior factual allegations as if fully set forth herein.

69. As alleged in this Complaint, the Defendants agreed and conspired to conduct and participate in the conduct of the affairs of Nissan of Albertville through a pattern of racketeering activity.

70. Defendants have engaged in the illegal conduct mentioned above as part of a common scheme or conspiracy. This conspiracy could not have been achieved effectively without the willful direction and participation, or knowledge, approval, and ratification of Defendants.

71. Defendants, with knowledge and intent, conspired and agreed to conduct and participate in enterprise through a pattern of racketeering activity. Defendants know that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the fraudulent scheme alleged in this Complaint.

16

72.  Defendants have, therefore, conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the enterprise through a pattern of racketeering activity in violation of 18. U.S.C. § 1962(d).

73.  Moreover, for the fraudulent scheme to be successful, Defendants and members of Nissan of Albertville had to agree to enact and utilize the same devices and fraudulent tactics against Plaintiffs and others.

74.  As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962 (d), Plaintiff and Class Members have been injured in their business, property, and/or creditworthiness in that, among other things, were indebted by fraudulent means, and/or paid for additional add/on products that were fraudulently packed into their loans without their knowledge.

## COUNT THREE
### (Aiding and Abetting a Violation of RICO (18 U.S.C. § 2))

75.  Plaintiff adopts and incorporates by reference all prior factual allegations as if fully set forth herein.

76.  Defendants and members of the enterprise knowingly, and with shared intent, sought to, and have aided and abetted each of the other

members of the enterprise in the commission of the predicate acts and pattern of racketeering activity in violation of the RICO count above.

77. As a result, under 18 U.S.C. § 2, the RICO violations of each member of the enterprise are those of the others as if they had been committed directly by them.

78. As a direct and proximate result of the fact that Defendants aided and abetted others in violating the sections of RICO described above, Plaintiff and Class Members have been injured in their business and property by the predicate acts which make up Defendants and members of the enterprise's pattern of racketeering activity.

79. Specifically, Plaintiff and Class Members have been injured in their business or property in that, among other things, they paid for features not on the vehicle, paid a fraudulently inflated purchase price, were indebted by fraudulent means, and/or paid for additional add-on products that were fraudulently packed into their loans without their knowledge. Defendants are therefore liable for the RICO violations committed by other members of the enterprise as if Defendants had committed them directly.

## COUNT FOUR
### (Identity Theft)

80. Plaintiff adopts and incorporates by reference all prior factual allegations as if fully set forth herein.

81. Alabama's "Consumer Identity Protection Act" (Ala. Code § 13A-8-190 et seq.) found in the Alabama Criminal Code, provides for criminal and civil remedy where a person's identifying information is used to violate the Act.

82. Alabama Code § 13A-8-191(2) defines "identifying information" as "[a]ny information, used either alone or in conjunction with other information, that specifically identifies a person or a person's property," which includes, but is not limited to, a person's: name, social security number, financial services account numbers, and "[a]ny other numbers or information that can be used to access a person's financial resources, obtain identification, act as identification, or obtain good or services."

83. Ala. Code § 13A-8-191(3) defines a "victim" as any "person whose identification documents or identifying information are used to" violate the Act.

84. Ala. Code § 13A-8-192 provides, in part, that a person violates the Act if, without the authorization, consent, or permission of the victim, and

with the intent to defraud for his or her own benefit or the benefit of a third person, he or she does any of the following:

    a. Obtains, records, or accesses identifying information that would assist in accessing financial resources, obtaining identification documents, or obtaining benefits of the victim.

    b. Obtains goods or services through the use of identifying information of the victim.

    c. Obtains identification documents in the victim's name.

85. Alabama Code § 13A-8-199 provides a civil remedy for violations of Section 13A-8-192, in addition to other remedies provided by law, under which the "victim" may recover the greater of Five Thousand Dollars ($5,000.00) or three (3) times actual damages for each incident, plus attorney's fees, expenses, and court costs.

86. Plaintiff and Class Members are "victims" as defined under the Consumer Identity Protection Act.

87. Defendants and/or members of enterprise used Plaintiff's and Class Members' identifying information in such a way as to have violated Section 123A-8-192 of the Act.

88. Defendants and/or members of enterprise used Plaintiff's and Class Members' identifying information without permission, with intent, for their own profit, for the purpose of defrauding the Plaintiff and Class

Members, all in such a way as to have violated Section 13A-8-192 of the Act.

89.   Defendants and/or members of the enterprise are liable to Plaintiff and Class Members under the Consumer Identity Protection Act for all remedies available under the Act.

## COUNT FIVE
### (Unjust Enrichment)

90.   Plaintiff adopts and incorporates by reference all prior factual allegations as if fully set forth herein.

91.   Defendants and members enterprise have received a benefit at the expense of Plaintiff and Class Members by providing loans to customers with credit problems and/or insufficient income for which they would not have been approved without the Defendants' fraudulent scheme.

92.   Defendants intended to, and have benefited from, the fraudulent scheme by, among other things, selling vehicles to buyers that otherwise would not have been approved for such vehicles, increasing profits from fraudulently inflated sales prices, and receiving additional profits by packing loans to incorporate the cost of additional products - such as a vehicle service contract, warranty, or gap contract - all without buyer's knowledge.

93. It is unjust and inequitable to permit Defendants to retain the benefits they have obtained through their scheme to defraud by means of false pretenses, representations or promises. The financial benefits obtained by Defendants should not, in fairness, be retained by them but rather should be paid and returned to Plaintiff and Class Members.

94. As a direct and proximate result of the inequitable conduct by Defendants and members of the enterprise, Plaintiff and Class Members suffered pecuniary loss, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT SIX
### (Fraud)

95. Plaintiff adopts and incorporates by reference all prior factual allegations as if fully set forth herein.

96. When purchasing an automobile, buyers such as Plaintiff and Class Members trusted Defendants and members of the enterprise to provide truthful information during the financing process and to honestly handle their vehicle financing.

97. As a routine practice of Defendants, and at the direction of Defendants – known and unknown, with their participation, or with their full knowledge, approval, and ratification, would tell the buyer what the monthly payment on the automobile would be without providing any

other meaningful financial disclosure(s); if the buyer appeared hesitant, Defendants and members of the enterprise would falsely tell the purchaser they could refinance the automobile, and lower the monthly payment, after making payments for a period of time.

98. As a routine practice Defendants and members of the enterprise would retain control of each sheet of paper when a buyer was signing the closing documents, exposing only the signature lines and telling the buyer only where to sign or initial – initial here, initial there; sign here, sign there. Additionally, Defendants and members of the enterprise would not provide the closing documents for buyers to review prior to or during their execution. Buyers were therefore denied any meaningful opportunity to read the closing documents and prevented from reviewing or understanding what they were actually financing and prevented from understanding the total amount they will have paid after making all scheduled payments.

99. In the process of arranging financing and executing closing documents, Plaintiff and Class Members were harmed when Defendants and member of the enterprise fraudulently obtained the loan, inflated the loan amount, quoted an inflated monthly payment, and/or "packed" the loan with the cost of add-on products - such as vehicle service contract, warranty, or gap contract.

100. Defendants and members of the enterprise misrepresented these facts to Plaintiff and Class Members. All members of the enterprise are automobile dealers or employees of dealers and engage in loan financing on a regular basis in the course of their business. There is an inherent disparity of knowledge between the customer and Defendants and members of the enterprise.

101. The facts misrepresented by Defendants were material to Plaintiff and Class Members. Reasonable consumers, including Plaintiff and Class Members, would not have executed the closing documents had they known that Defendants had withheld these facts.

102. Defendants misrepresented these material facts to induce Plaintiff and Class Members to execute their closing documents, and they did execute these documents without knowledge of these material facts.

103. As a direct and proximate result of the misrepresentations by Defendants, Plaintiff and Class Members purchased vehicles from Defendants and suffered pecuniary loss, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT SEVEN
### (Fraudulent Suppression)

104. Plaintiff adopts and incorporates by reference all prior factual allegations as if fully set forth herein.

105.    When purchasing an automobile, buyers such as Plaintiff and Class Members trusted Defendants and members of the enterprise to provide truthful information during the financing process and to honestly handle their vehicle financing.

106.    As a routine practice of Defendants, and at the direction of Defendants – known and unknown, with their participation, or with their full knowledge, approval, and ratification, would tell the buyer what the monthly payment on the automobile would be without providing any other meaningful financial disclosure(s); if the buyer appeared hesitant, Defendants and members of the enterprise would falsely tell the purchaser they could refinance the automobile, and lower the monthly payment, after making payments for a period of time.

107.    As a routine practice Defendants and members of the enterprise would retain control of each sheet of paper when a buyer was signing the closing documents, exposing only the signature lines and telling the buyer only where to sign or initial – initial here, initial there; sign here, sign there. Additionally, Defendants and members of the enterprise would not provide the closing documents for buyers to review prior to or during their execution. Buyers were therefore denied any meaningful opportunity to read the closing documents and prevented from reviewing or understanding what they were actually financing and

prevented from understanding the total amount they will have paid after making all scheduled payments.

108. In the process of arranging financing and executing closing documents, Plaintiff and Class Members were harmed when Defendants and member of the enterprise fraudulently obtained the loan, inflated the loan amount, quoted an inflated monthly payment, and/or "packed" the loan with the cost of add-on products - such as vehicle service contract, warranty, or gap contract.

109. Defendants and members of the enterprise have a duty to disclose these facts to Plaintiff and Class Members. All members of the enterprise are automobile dealers or employees of dealers and engage in loan financing on a regular basis in the course of their business. There is an inherent disparity of knowledge between the customer and Defendants and members of the enterprise.

110. The facts withheld by Defendants were material to Plaintiff and Class Members. Reasonable consumers, including Plaintiff and Class Members, would not have executed the closing documents had they known that Defendants had withheld these facts.

111. Defendants withheld these material facts to induce Plaintiff and Class Members to execute their closing documents, and they did execute these documents without knowledge of these material facts.

112.   As a direct and proximate result of the fraudulent concealment by Defendants, Plaintiff and Class Members purchased vehicles from Defendants and suffered pecuniary loss, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT EIGHT
### (Promissory Fraud)

113.   Plaintiff adopts and incorporates by reference all prior factual allegations as if fully set forth herein.

114.   When purchasing an automobile, buyers such as Plaintiff and Class Members trusted Defendants and members of the enterprise to provide truthful information during the financing process and to honestly handle their vehicle financing.

115.   As a routine practice of Defendants, and at the direction of Defendants – known and unknown, with their participation, or with their full knowledge, approval, and ratification, would if the buyer appeared hesitant, falsely represent and promise the purchaser that they could refinance the automobile, and lower the monthly payment, after making payments for a period of time.

116.   That representation and promise was false, known to be false, and when made was false.

117. The Defendants never had any intention of refinancing the loan or assisting in refinancing the loan.

118. Defendants and members of the enterprise have a duty to disclose these facts to Plaintiff and Class Members. All members of the enterprise are automobile dealers or employees of dealers and engage in loan financing on a regular basis in the course of their business. There is an inherent disparity of knowledge between the customer and Defendants and members of the enterprise.

119. The facts misrepresented and promises made by Defendants were material to Plaintiff and Class Members. Reasonable consumers, including Plaintiff and Class Members, would not have executed the closing documents had they known that Defendants had misrepresented these facts.

120. Defendants misrepresented these material facts to induce Plaintiff and Class Members to execute their closing documents, and they did execute these documents without knowledge of these material facts.

121. As a direct and proximate result of the fraud by Defendants, Plaintiff and Class Members purchased vehicles from Defendants and suffered pecuniary loss, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT NINE
### (Negligence, Wantonness, and/or Reckless Conduct)

122.  Plaintiff adopts and incorporates by reference all prior factual allegations as if fully set forth herein.

123.  Defendants owed Plaintiff and Class Members a duty not to be wanton, negligent, and/or reckless in their conduct toward Plaintiff and Class Members, including but not limited to the following conduct: (1) creating false documents and/or materially altering documents; (2) obtaining financing-related documents by fraudulent means: (3) charging and financing an inaccurate and fraudulently inflated loan amount and sales price; (4) quoting a fraudulently inflated monthly payment; (5) "packing" transactions with the cost of add-on products, such as a vehicle service contract, warranty, or gap contract; (6) making material misrepresentations and communications to third parties regarding Plaintiff's and Class Members' financial abilities and identifying information, knowing that Plaintiff and Class Members would be harmed by third parties' reliance on such misrepresentations; and/or (7) engaging in other conduct inconsistent with Defendants' obligations and duties under the contract, federal and state law.

124.  Defendants breached their duties. Defendants were willful, wanton, negligent, and/or reckless in their use of Plaintiff's and Class Members'

personal and identifying information, including the theft and misuse of Plaintiff's and Class Members' identity, intentionally and knowingly false, misleading and deceptive information regarding Plaintiff and Class Members to facilitate the lease/sale of a vehicle to them and to facilitate the lease/sale of the falsified financing contracts to third parties to maximize profits for Defendants and the enterprise.

125. Defendants were negligent, wanton, and/or reckless in their conduct regarding Plaintiff and Class Members in that Defendants caused damages to Plaintiff and Class Members. Defendants also know or should have know that Plaintiff and Class Members would foreseeably suffer injury as a result Defendants' negligent, wanton, and/or reckless conduct and actions alleged herein.

126. As a direct and proximate result of the negligent, wanton, and/or reckless conduct and actions of Defendants, Plaintiff and Class Members suffered pecuniary loss, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT TEN
### (Negligent Training, Supervision, and/or Retention)

127. Plaintiff adopts and incorporates by reference all prior factual allegations as if fully set forth herein.

128. Defendants owed Plaintiff and Class Members a duty of care and professionalism in the rendition of the services rendered and products sold to Plaintiff and Class Members; in training and supervising Defendants and the enterprise and/or their agents, assigns, servants, managers, and/or employees to perform those services in full compliance with the laws of the State of Alabama and the Federal Government; in not engaging in, or allowing Defendants and the enterprise and/or their agents, assigns, servants, managers, and/or employees, to engage in the wrongful practices herein alleged; in not suppressing or concealing such activities or enabling Defendants and the enterprise and/or their agents, assigns, servants, managers, and/or employees to do so, and in not terminating or otherwise disciplining those known to have violated company policies and state and/or federal laws and/or regulations by engaging in the misconduct herein alleged.

129. Defendants owed duties to Plaintiff and Class Members in putting forth loyal, honest, and fair dealing agents, assigns, servants, managers, and/or employees who act in compliance with Federal and State laws regarding the sale, titling, and financing of vehicles, as well as the proper methods utilized for credit inquiry and Defendants' superior knowledge of those respective industries, its practices, and Defendants' practices, policies and/or procedures. Defendants' negligent retention of

agents, assigns, servants, managers, and/or employees known to have engaged in the misconduct described herein acted as ratification of such misconduct and resulted in the aiding and abetting of unlawful conduct.

130. The Defendants, collectively, separately, or as agents, breached the duties owed to Plaintiff and Class Members, and such breaches arise out of the negligent or wanton conduct of the Defendants and those who acted in concert or conspiracy with Defendants or acted as their agents, assigns, servants, managers, and/or employees, and in the line and scope of their business, contractual, and/or statutory and/or regulatory duties, in order to preserve and protect the financial interest of the Defendants and those who acted in concert or conspiracy with them.

131. Defendants and the enterprise knew or should have know of the wrongful, fraudulent practices engaged in by their agents, assigns, servants, managers, and/or employees, and knew or should have known that their own training, supervision, and/or retention practices were inadequate to fulfill their obligations to protect the public, Plaintiff and Class Members.

132. Defendants and the enterprise knew or should have known that their policies, practices, and/or procedures in training, supervising, and retaining such agents, assigns, servants, managers, and/or employees

were inadequate to prevent or detect the misconduct described herein, and such inadequate policies, procedures, and/or practices were the actual and proximate cause of Plaintiff's and Class Members' injuries.

133.   Plaintiff and Class Members have incurred damages proximately caused by Defendants' negligence in training, supervising, and retaining their agents, assigns, servants, managers, and/or employees.

134.   As a result, Defendants' conduct breached said duties to Plaintiff and Class Members and were wanton, negligent and/or reckless.

135.   As a proximate result of the aforementioned conduct and actions of Defendants, Plaintiff and Class Members suffered pecuniary loss as described above in an amount to be proven at trial, incidental and consequential damages, as well as severe mental anguish and emotional distress.

## COUNT ELEVEN
### (Civil Conspiracy)

136.   Plaintiff adopts and incorporates by reference all prior factual allegations as if fully set forth herein.

137.   Defendants willfully, knowingly, and intentionally agreed and conspired with each other for the purpose of engaging in unlawful conduct, for unlawful purposes, including without limitation acts of fraud as alleged in this Complaint, the furtherance of their schemes,

and for the purpose of engaging in otherwise lawful conduct by wrongful conduct and means.

138. Defendants and the enterprise committed the acts alleged pursuant to, and in furtherance of, that agreement and furthered the conspiracy by cooperating, encouraging, ratifying, and/or adopting the acts of others.

139. As a direct and proximate result of the acts in furtherance of the conspiracy, Plaintiff and Class Members have suffered injury, damage, loss, and harm as described above. The wrongful conduct committed pursuant to the conspiracy was a substantial factor in causing harm to Plaintiff and Class Members.

140. The conspiracy to commit, and the commission of, these wrongful acts by Defendants and the enterprise were willful, malicious, oppressive, and in wanton and conscious disregard of Plaintiff's and Class Members' rights.

141. Plaintiff and Class Members are entitled to an award of punitive damages to punish Defendants and the enterprise's wrongful conduct and actions and to deter future wrongful conduct and actions.

142. As a result, Plaintiff and Class Members have been damaged as described above in an amount to be proven at trial.

# **PRAYER FOR RELIEF**

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff and Class Members respectfully request this Honorable Court to enter Judgment against Defendants and award relief as follows:

A.   Certify a class action as set out above;

B.   Compensatory damages, in amounts to be determined, which shall include loss of monies, incidental and consequential damages, severe mental anguish and emotional distress;

C.   Three (3) times the amount of Plaintiff's and the others' compensatory damages, in amounts to be determined, costs of the suit, expenses of litigation, and reasonable attorneys' fees as provided by 18 U.S.C. § 1964(c);

D.   Damages under the Alabama Consumer Identity Protection Act, in an amount this Court and Jury deems appropriate to compensate Plaintiff and Class Members for three (3) times their actual damages, or Five Thousand Dollars ($5,000), whichever is greater, as well as attorneys' fees and costs;

E.   Punitive damages to punish Defendants and the enterprise's wrongful conduct and actions and to deter future wrongful conduct and actions, to be determined by the Jury;

F.   Such other and further relief, supplemental, alternative, different, and/or additional damages, pre and post-judgment interest, costs, fees, attorney's fees, or equitable relief as this Court and Jury deem proper.

## <u>DEMAND FOR JURY TRIAL</u>

**PLAINTIFFS DEMAND TRIAL BY STRUCK JURY ON ALL CLAIMS RAISED HEREIN, INCLUDING CLASS CLAIMS**

**DATED: March 18, 2019**

Respectfully submitted,

*/s/ Jason L. Yearout*
Jason L. Yearout, (ASB-4487-T80J)
*Attorney for Plaintiffs*
**YEAROUT & TRAYLOR, P.C.**
3300 Cahaba Road, Suite 300
Birmingham, AL 35223
t. 205.414.8160
f. 205.795.7169
e. jyearout@yearout.net

*/s/ J. Gusty Yearout*
J. Gusty Yearout, (ASB-6253-A43J)
*Attorney for Plaintiffs*
**YEAROUT & TRAYLOR, P.C.**
3300 Cahaba Road, Suite 300
Birmingham, AL 35223
t. 205.414.8160
f. 205.414.8199
e. gyearout@yearout.net

*/s/ Freddy Rubio*
Sigfredo Rubio (ASB-5403-D62R)
*Attorney for Plaintiffs*
**RUBIO LAW FIRM, P.C.**
438 Carr Avenue, Suite 1
Birmingham, AL 35209
t. 205.443.7858
e. frubio@rubiofirm.com

**PLAINTIFFS REQUEST SERVICE OF DEFENDANTS BY U.S. CERTIFIED MAIL**